# In the United States Court of Federal Claims

No. 16-1489
Filed: May 9, 2018
PUBLIC VERSION[*]

| | | |
|---|---|---|
| ************************************ | | 5 U.S.C. § 706 (Administrative Procedure Act, Scope of Judicial Review); |
| | * | 15 U.S.C. §§ 631, 633 (Small Business Act); |
| VETERANS TECHNOLOGY, LLC, | * | 28 U.S.C. § 1491 (Bid Protest Jurisdiction); |
| | * | 13 C.F.R. §§ 121.101 (What Are SBA Size |
| | * | Standards?); 121.102 (How Does Small |
| Plaintiff, | * | Business Administration ("SBA") Establish |
| | * | Size Standards); 121.103 (How Does SBA |
| v. | * | Determine Affiliation); 121.104 (How Does |
| | * | The SBA Calculate Annual Receipts?); |
| THE UNITED STATES, | * | 121.1001 (Who May Initiate A Size Protest |
| | * | Or Request A Formal Size Determination?); |
| | * | 121.1002 (Who Makes A Formal Size |
| Defendant, | * | Determination?); 121.1003 (Where Should A |
| | * | Size Protest Be Filed?); 121.1009 (What Are |
| and | * | The Procedures For Making The Size |
| | * | Determination); 121.1101 (Are Formal Size |
| | * | Determinations Subject To Appeal?); 134.223 |
| LSINC CORPORATION, | * | (Evidence); 134.314 (Standard Of Review |
| | * | And Burden Of Proof); 134.316 (The Record); |
| | * | 48 C.F.R. §§ 1.602 (Contracting Officers); 15.305 |
| Intervenor-Defendant. | * | (Proposal Evaluation); 43.102 (Policy); |
| | * | 52.249-6 (Termination); and |
| | | Rule of the United States Court of Federal |
| | | Claims ("RCFC") 24 (Intervention); 52.1 |
| ************************************ | * | (Motion for Judgment on the Administrative Record). |

**Paul D. Clement**, Kirkland & Ellis LLP, Washington, D.C., Counsel for Plaintiffs.

**Richard P. Schroeder**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**David Samuel Cohen,** Cordatis LLP, Arlington, Virginia, Counsel for Intervenor-Defendant.

## MEMORANDUM OPINION AND FINAL ORDER ON REMAND

---

[*] On May 4, 2018, the court forwarded a sealed copy of this Memorandum Opinion and Final Order On Remand to the parties to redact any confidential and/or privileged information from the public version and note any citation or editorial errors that required correction. On May 7, 2018, Plaintiff filed a Response with proposed redactions. Neither the Government nor Intervenor-Defendant proposed any redactions. After considering the proposed redactions, the court made the redactions that appear in this Memorandum Opinion And Final Order On Remand.

**BRADEN**, *Chief Judge*.

To facilitate review of this Memorandum Opinion And Final Order, the court has provided the following outline.

I.   RELEVANT FACTUAL BACKGROUND AND THE COURT'S REMAND INSTRUCTIONS.

II.  THE SMALL BUSINESS ADMINISTRATION AREA OFFICE'S INVESTIGATION ON REMAND.

III. THE SMALL BUSINESS ADMINISTRATION AREA OFFICE'S SIZE DETERMINATION ON REMAND.

IV.  THE SMALL BUSINESS ADMINISTRATION'S OFFICE OF HEARINGS AND APPEALS' DECISION ON SIZE DETERMINATION ON REMAND.

V.   DISCUSSION - - - WHETHER THE SMALL BUSINESS ADMINISTRATION'S OFFICE OF HEARINGS AND APPEALS' REMAND DECISION WAS "UNLAWFUL, ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, OR OTHERWISE NOT IN ACCORDANCE WITH THE LAW."

    A.   The Parties' Arguments.

        1.   Veterans Technology, LLC's Motion For Judgment On The Administrative Record.

        2.   The Government's Response And Cross-Motion For Judgment On The Administrative Record.

        3.   LSINC Corporation's Response And Cross-Motion For Judgment On The Administrative Record.

        4.   Veterans Technology, LLC's Reply In Support Of The Motion For Judgment On The Administrative Record And Response To The Government's Cross-Motion.

        5.   The Government's Reply In Support Of The Cross-Motion For Judgment On The Administrative Record.

        6.   LSINC Corporation's Reply In Support Of The Cross-Motion For Judgment On The Administrative Record.

    B.   The Court's Resolution.

VI.  CONCLUSION.

## I.   RELEVANT FACTUAL BACKGROUND AND THE COURT'S REMAND INSTRUCTIONS.[*]

On June 26, 2015, the Missile Defense Agency ("Missile Defense") issued Solicitation No. HQ0147-15-R-0019 (the "Solicitation") seeking offers to provide "support to the Ballistic Missile Defense System in the areas of strategic planning and financial management, cost estimating, and analysis, earned value management, accounting and financial systems support and integration." AR 2623.  The Solicitation was set aside for a small business concern with an annual revenue of $15 million or less, under North American Industry Classification System ("NAICS") code 541611.  AR 2623.

On April 1, 2016, Missile Defense awarded Veterans Technology, LLC ("Vet Tech"), a joint venture between MDW Associates, LLC ("MDW") and Defense Acquisition, Inc. ("DAI"), Contract No. HQ0147-16-C-0028 (the "Contract").  AR 1686–87.

On April 6, 2016, Middle Bay Solutions II, LLC[1] filed a "size protest" with a Small Business Administration ("SBA") Area Office (the "SBA Area Office") challenging the small business status of Vet Tech, because it allegedly was affiliated with ECS Federal, LLC ("ECS"), a large business.  AR 2623.

On May 2, 2016, the SBA Area Office issued a size determination finding that Vet Tech did not qualify as a small business concern, because it was affiliated with ECS.  AR 724, 1795, 1896, 2628–30. On May 17, 2016, Vet Tech filed an appeal of the SBA Area Office's size determination with the Small Business Administration's Office of Hearings and Appeals (the "SBA OHA").  AR 2660.

On July 20, 2016, the SBA OHA affirmed the SBA Area Office's May 2, 2016 size determination.  AR 3820–43. On July 29, 2016, Missile Defense "completely terminated" the Contract with Vet Tech, pursuant to Federal Acquisition Regulation ("FAR") 52.249-6, because of the SBA OHA's July 20, 2016 ruling disqualifying Vet Tech as a small business.  AR 2807. Thereafter, Missile Defense re-issued the Solicitation, but represented to the court that it would not make a contract award, until this bid protest was resolved.  11/17/16 Erskine Decl. ¶¶ 2–3.

On November 10, 2016, Vet Tech filed a Complaint in the United States Court of Federal Claims alleging that the SBA's size determination was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law," because the SBA OHA misinterpreted 13 C.F.R. § 121.103(f) (2015) and failed to consider relevant evidence of MDW's independence from ECS.  Compl. at ¶¶ 44–45 (quoting 5 U.S.C § 706(2)(A)).

---

[*] The facts discussed herein were derived from the Administrative Record ("AR 1–2837"), as supplemented on October 11, 2017 ("AR 2838–3867").

[1] Middle Bay Solutions II, LLC is no longer a party in the above-captioned case.

On August 2, 2017, the court issued a Memorandum Opinion And Order remanding the SBA OHA's July 20, 2016 decision to the SBA OHA for sixty days to

> instruct the SBA[] Area Office . . . ***to ascertain whether the actions of [the Department of Defense ("DOD")] and/or Missile Defense were the cause of MDW entering into a subcontracting relationship with ECS***, as well as to consider evidence proffered by MDW that, at no time, was MDW economically dependent on ECS.

*See Veterans Tech., LLC v. United States*, 133 Fed. Cl. 146, 162 (Fed. Cl. 2017) (bold and italics added).

## II.    THE SMALL BUSINESS ADMINISTRATION AREA OFFICE'S INVESTIGATION ON REMAND.

On August 4, 2017, the SBA OHA ordered the SBA Area Office to prepare a new size determination, in accordance with the court's August 2, 2017 Memorandum Opinion And Order, by August 18, 2017.  AR 2838.

On August 9, 2017, the SBA Area Office asked the Missile Defense Contracting Officer (the "Contracting Officer") and Vet Tech to "fully explain, in detail, all facts and circumstances pertaining to the subcontracting relationship between MDW and ECS, including the subcontracting relationship's formation and whether the actions of [Missile Defense] were the cause of the subcontracting relationship."  AR 2838–39.

> That same day, the SBA Area Office also asked Vet Tech to
>
> provide the contract number for the [Missile Defense Agency Engineering And Support Services ("MiDAESS")] Contract Financial Management Task Order and the dates of performance for this contract and for each year (2012, 2013[,] and 2014) the amount earned for this one task order.
>
> Separately provide the contract numbers and the amount earned for the relevant years [(]2012, 2013[,] and 2014) from other contracts that were not tied to the above mentioned task order.  Please include contracts awarded and revenues earned through August 26, 2015.
>
> Include any contracts awarded in 2016 and the source of the revenue and agency.
>
> Please also provide any agreements from 2012 through 2016[,] including teaming, joint venture[,] and subcontracting agreements.

AR 2839 (email from the SBA Area Office to Vet Tech (Aug. 9, 2017)).

On August 10, 2017, the Contracting Officer responded to the SBA Area Office by email:

> As the Contracting Officer with cognizance over the MiDAESS contract at issue, I never issued any such direction to ECS with respect to MDW or any other subcontractor; [t]o the best of my knowledge[,] I am not aware of anyone else with contractual authority issuing any such direction. In addition, a review of the contract file revealed no documentation in support of the "directed subcontractor" assertion.

AR 2845 (email from the Contracting Officer to the SBA Area Office (Aug. 10, 2017)).

On August 11, 2017, Vet Tech submitted a Memorandum, together with Exhibits A–D to the SBA Area Office. AR 2847–56. Exhibit A is a compilation of MDW's "agreements, including subcontract agreements, joint venture agreement, and teaming agreements[.]" AR 2847. Exhibit B is a subcontract between Paradigm Technologies, Inc. ("Paradigm")[2] and MDW to perform strategic planning and financial management, cost estimating and analysis, earned value management, accounting and financial systems support, and integration on the MiDAESS Financial Management Task Order. AR 2623, 2855. Exhibit C is the September 23, 2016 Sworn Declaration of Mr. Mark Maguire, President and Chief Executive Officer ("CEO") of MDW. AR 2855. Exhibit D is the September 16, 2016 Sworn Declaration of George H. Wilson, who was the Chief Strategy Officer at Paradigm, but after ECS's acquisition, became the President and CEO of ECS.[3] AR 2856, 3609.

---

[2] Paradigm became a wholly-owned subsidiary of ECS during calendar year 2012; all Paradigm contracts subsequently were novated to ECS. AR 728, 2417.

[3] Neither of these two sworn Declarations were submitted to or considered by the SBA Area Office, when it made an initial May 2, 2016 Size Determination as to whether Vet Tech rebutted the presumption of economic dependence, because they were prepared for and submitted "in a [different] follow-on size determination proceeding" after the SBA OHA's July 20, 2016 Decision. AR 2856 (citing *Size Appeal of MDW Assocs., LLC*, SBA No. SIZ-5794 (Dec. 5, 2016) (ruling that MDW "is not a small business due to economic dependence upon ECS"). MDW did not challenge the SBA OHA's ruling in that case, where the procurement at issue concerned a request for proposals by Missile Defense for a different service, *i.e.*, "international affairs and foreign military sales support for the development and execution of a ballistic missile defense system." *Id.* at *1. The procurement at issue in this case was to provide Missile Defense with "support to the Ballistic Missile Defense System in the areas of strategic planning and financial management, cost estimating and analysis, earned value management, accounting, and financial systems support and integration." AR 2623.

In the September 16, 2016 Sworn Declaration, Mr. Wilson stated, in relevant part, that:

3.  Mr. Maguire's role at Paradigm involved working in contract management on a task order under Paradigm's prime contract with [Missile Defense] for the [MiDAESS] procurement.

4.  [Mr.] Maguire was not an officer, director, principal stockholder, managing member or key employee of Paradigm.  Although [Mr.] Maguire had the title of Vice President of Paradigm, he was not a corporate officer of Paradigm.

*          *          *

6.  Mr. Maguire's duties at Paradigm as Vice-President concerned only contract management.  Mr. Maguire served as key personnel on the [MiDAESS F]inancial [M]anagement [T]ask [O]rder issued under Paradigm's MiDAESS prime contract. Mr. Maguire did not have any critical influence or ability to substantively control the overall direction and management of Paradigm from the time of the acquisition up until he left the employment of Paradigm.

*          *          *

7.  In March 2012, Mr. Maguire was working as key personnel on the [MiDAESS F]inancial [M]anagement [T]ask [O]rder issued under Paradigm's MiDAESS contract.  In a meeting with me that month, Mr. Maguire stated that he and Mr. Lee Dixson were planning to leave Paradigm, and had formed MDW as a separate business.  After learning this information, I told Mr. Maguire and Mr. Dixson they would be terminated from Paradigm and were free to pursue the establishment of MDW.

8.  *Shortly [thereafter, Missile Defense's] lead on the MiDAESS [F]inancial [M]anagement [T]ask [O]rder requested a meeting with me, which took place in April 2012.  At this meeting [Missile Defense] informed me that Mr. Maguire and Mr. Dixson had knowledge and skills essential to supporting [Missile Defense].* After that meeting, ECS began negotiating a subcontract with MDW, which was ultimately executed and began on August 1, 2012.  The lag between April and August was caused by administrative requirements associated with security matters and the contracting process.  Mr. Maguire left the employment of Paradigm on August 1, 2012.

AR 3625 (Wilson Decl. ¶¶ 3, 4, 6–8) (italics added).

In the September 23, 2016 Sworn Declaration, Mr. Maguire stated, in relevant part, that:

3.  Messrs. Walker, Dixson, and I personally financed MDW with our own resources, without any outside capital or assistance.  More specifically, the three of us made a combined capital contribution of ▇▇▇▇ to MDW.  No outside capital or assistance has been provided to MDW.  In April 2013, MDW received its first line of credit from ▇▇▇▇ in the amount of ▇▇▇▇.  At that time, MDW

switched banks to ████████ which increased the line to ████. MDW has never had to draw on its line of credit. The initial capital contribution and its receivables have been sufficient to support operations.

\* \* \*

6. I was not an officer, director, principal stockholder, managing member or key employee of Paradigm. Although I had the title of Vice President, I was not a corporate officer of Paradigm. I did not have any critical influence or ability to substantively control overall direction and management of Paradigm, either before or after [ECS's] acquisition of Paradigm, including and up to the time I left employment of Paradigm. In addition, I was never an employee of ECS, nor was I ever an officer, director, principal stockholder, or managing member of ECS. Specifically, my role at Paradigm was limited to serving as a Subject Matter Expert manager working directly on a single MiDAESS [Financial Management T]ask [O]rder [DOB-02-10, issued under Prime Contract HQ0147-10-D-0020]. Messrs. Walker and Dixson have never been employees of ECS. In fact, none of the four owners of MDW have ever been ECS employees.

7. I was not informed of, and had no input into, the decision by Paradigm to be acquired by ECS. Unlike those Paradigm employees viewed as key by ECS, I was not required to sign a non-competition agreement by ECS. Mr. Dixson was also employed by Paradigm at the time of the ECS acquisition of Paradigm, and he and I viewed the acquisition as a jumpstart to form MDW and pursue our own business interests apart from ECS and Paradigm. We, therefore, formed MDW in February 2012 and shortly thereafter, in March 2012, informed ECS'[s] then-Chief Strategy Officer, [Mr.] Wilson (who is now the ECS Chief Executive Officer) that we planned to resign from Paradigm in order to focus on MDW. In response, Mr. Wilson escorted me and Mr. Dixson out of the office and told us that we would be fired, effective the next Monday.

8. Mr. Dixson and I informed Paradigm's customer[ Missile Defense], that we would no longer be supporting the financial management task order on Paradigm's MiDAESS contract. *Subsequently, [Missile Defense] met with Mr. Wilson and instructed him that Mr. Dixson and I were key personnel on a team for the MiDAESS [Financial Management] Task Order and, for that reason, we had to remain as personnel on the task order. Therefore, to satisfy [Missile Defense], we agreed to remain employees of Paradigm for a short transition period until a subcontract could be negotiated between Paradigm and MDW.*

\* \* \*

23. From the time of MDW's formation through the present, MDW has had no financial or technical assistance, indemnification, bonding support (including bid or performance bonds) or other facilities from ECS. There are no financial, management, or ownership relationships between MDW and ECS. Thus, besides

subcontract work, ECS has provided no support to MDW, financial or otherwise, since MDW's formation in 2012.  ECS and MDW do not share facilities, employees or resources.

AR 3608–09, 3611 (Maguire Decl. ¶¶ 3, 6–8, 23) (italics added); *see also* AR 213, 2534.

On August 14, 2017, the SBA Area Office asked Vet Tech:

Did [Vet Tech]/ECS ask for approval for a new subject matter[] expert?

If so, please provide all facts, circumstances, and documentation that reflects this request and [Missile Defense's] response.  If [Vet Tech]/ECS did not seek such an approval, why not?

Please explain in detail[] the viability of MDW without the revenues earned from the task[] orders with ECS.  You indicated in your response that MDW has no debt[,] but you did not include rent, salaries of employees[,] and other operating expenses required to continue the business operations.  Would the business suffer any losses with the revenue stream from the other contracts that were awarded without ECS task orders?

AR 2637 (email from the SBA Area Office to Vet Tech (Aug. 14, 2017)).

On August 14, 2017, Vet Tech responded:

Vet Tech was not in existence at the time MDW entered into its subcontract with Paradigm in 2012.  *It is MDW's understanding that Missile Defense's lead told [Mr.] Wilson of ECS that Paradigm could not fire Messrs. Maguire and Dixson as they were key personnel with knowledge and skills essential to supporting Missile Defense, and that they had to remain as personnel [on the task order.]*  MDW understands that, given Missile Defense's insistence that Messrs. Maguire and Dixson could not be fired, Paradigm determined that, rather than asking for approval for a new subject matter expert, the easiest path would be to transition Messrs. Maguire and Dixson's positions to a subcontract to MDW without seeking new subject matter experts.

AR 3630 (email from Vet Tech to the SBA Area Office (Aug. 14, 2017) (italics added)).

On August 15, 2017, the SBA Area Office also asked Vet Tech:

How many Vice Presidents were at Paradigm?  Mr. Maguire as Vice President of Operations how many employees did he supervise?  What was the total number of employees at Paradigm?  Can you provide the officer's/management organizational chart that was in existence at that time for Paradigm?

AR 3635 (email from the SBA Area Office to Vet Tech (Aug. 15, 2017)).

On August 15, 2017, Vet Tech responded:

> There were at least 4 vice presidents for Paradigm of which Mr. Maguire was one. The others were Tim Wilde, Furney Wood, and Dave Bowers. The latter three may have had critical influence or the ability to substantively control the operations of Paradigm, but Mr. Maguire did not.
>
> An attached presentation document prepared by Paradigm in August 2011 for ECS (and which MDW obtained in connection with the size protest of Vet Tech) includes an organization chart at page 10 identifying the individuals with control over the operations of Paradigm. The chart identifies Messrs. Wilde, Wood, and Bowers, but not Mr. Maguire, evincing Mr. Maguire's lack of control over Paradigm's operations. Although in a chart on page 11[,] Mr. Maguire is identified as a "key employee," he is so identified in his role as vice president of "MDA SME" meaning Missile Defense Subject Matter Expert. Mr. Wilde, in contrast is identified as the vice president for [MDW] as such. Although Mr. Maguire is key personnel for purposes of performing contractual services for Missile Defense (having twice receiv[ed] Missile Defense's Contactor of the Year Award), he is <u>not</u> identified as an executive or as having any critical influence or substantive control over Paradigm's company operations.
>
> \*       \*       \*
>
> Mr. Maguire did not supervise any employees of Paradigm. He did not hire, fire, or control the salaries of any Paradigm employees. This further evinces Mr. Maguire's lack of any control or influence over the operations of Paradigm. According to an attached ECS press release, at the time of the acquisition Paradigm had over 200 employees. The organization chart on page 10 of Paradigm's August 2011 presentation document, discussed above, indicates that Paradigm had 238 employees in August 2011.

AR 3633–34 (email from Vet Tech to the SBA Area Office (Aug. 15, 2017) (emphasis in original)).

The following chart was attached to Vet Tech's August 15, 2017 email:



AR 3649 (August 2011 Paradigm organization chart identifying the individuals with control over the operations).

## III.   THE SMALL BUSINESS ADMINISTRATION AREA OFFICE'S SIZE DETERMINATION ON REMAND.

On August 18, 2017, the SBA Area Office issued Size Determination No. 3-2017-052, that "[e]xamine[d] specifically whether the actions of DOD and/or Missile Defense were the cause of MDW entering into a subcontracting relationship with ECS." AR 3721–31. The SBA Area Office's August 18, 2017 Size Determination on remand found that

> the record reflects that [the Missile Defense] Lead told ECS that they could not fire Messrs. Maguire and Dixson and it was easier for ECS not to seek approval for making changes to key personnel; instead they wrote a subcontractor agreement between Paradigm and MDW. The net effect of this subcontractor arrangement is that it allowed a new entity MDW to have a steady source of income and have the majority of its revenues come from one source. The original contract was full and open and Messrs. Maguire and Dixon are key personnel on this contract and when ECS acquired Paradigm it needed the expertise of these individuals for performance of this contract, because the owners of MDW have many years of experience in missile defense and international security policy and analysis. For example, [Missile Defense] awarded Mr. Maguire twice in 2004 and 2009 "[Missile Defense] Contractor of the Year Award."

In another size protest (Size Case No. 2-2016-101-102-103) regarding MDW, Mr. George Wilson, President and CEO of ECS, stated to [the] SBA on September 16, 2016 that "[Missile Defense's] lead on the MiDAESS [F]inancial [M]anagement [T]ask [O]rder requested a meeting with me, which took place in April 2012.  At this meeting [Missile Defense] informed me that Mr. Maguire and Mr. Dixson had knowledge and skills essential to supporting [Missile Defense].  After that meeting, ECS began negotiating a subcontract with MDW, which was ultimately executed and began on August 1, 2012."  Also, Mr. Wilson, stated under penalty of perjury that it was his impression he could not replace in a short notice the key personnel, and the record reflects that the [Missile Defense] lead stated these two individuals could not be removed.  Despite assertions that the Contracting Officer offered no such instruction and that [Missile Defense's] file contains no documentation of what occurred in those communications, the response from the Contracting Officer does not directly contradict Vet Tech's assertions regarding the communications made by [Missile Defense's] "lead" on the task order.

*     *     *

Vet Tech has rebutted the 70% presumption of economic dependence with its showing that [Missile Defense] caused ECS and MDW's subcontracting relationship.  Further, the facts submitted by Vet Tech previously and on remand further demonstrate that MDW is not economically dependent on ECS, generally.  For example, as noted in Vet Tech's previous April 15, 2016 response to the size protest (AR 1783), MDW personnel have been involved with the [Missile Defense] Business Operations effort for nearly 15 years.  Mr. Maguire and Mr. Dixon are intimately familiar with all aspects of the work in [Missile Defense] Business Operations and have demonstrated exceptional performance with the agency.  Mr. Maguire . . . has been an advisor to multiple Directors [and was] awarded Contractor of the Year for his work in this specific area.  Thus, Vet Tech has rebutted the presumption of MDW's economic dependence on ECS[,] because ECS did not have the power to control MDW at [the] time of determining size.  To the contrary, Vet Tech has shown that ECS needed MDW for performance of the MiDAESS contract because of the skills and expertise of MDW's personnel, such as Mr. Maguire.  Because Vet Tech has shown that MDW was not economically dependent on ECS for these reasons, it is unnecessary to further examine Vet Tech's other proffered evidence regarding its non-ECS business, revenues, and debt.

Because MDW has successfully rebutted an identity of interest due to economic dependence with ECS, MDW is found not to be affiliated with ECS. 13 C.F.R. §121.103(f).

AR 3726–28.

Accordingly, the August 18, 2017 SBA Area Office Size Determination on remand determined that "the exception to affiliation among joint venture partners does not apply to this procurement and [Vet Tech] is found to be small and is eligible to receive the award[,] because each of the [joint venture] partners['s] size does not exceed[] the size standard corresponding to the NAICS code assigned to the procurement."  AR 3731.

## IV.   THE SMALL BUSINESS ADMINISTRATION'S OFFICE OF HEARINGS AND APPEALS' DECISION ON SIZE DETERMINATION ON REMAND.

On August 28, 2017, LSINC Corporation ("LSINC") filed an Appeal Petition at the SBA OHA challenging the SBA Area Office's August 18, 2017 Size Determination on remand. AR 3732–3804.[4]

On September 27, 2017, the SBA OHA issued a decision reversing the August 18, 2017 SBA Area Office's Size Determination on remand ruling that "the [SBA] Area Office clearly erred in finding that MDW was not affiliated with ECS," because: (1) the SBA Area Office "was unable to *corroborate* Vet Tech's version of events with [Missile Defense];" (2) the evidence submitted by Vet Tech to the SBA Area Office on remand does not evidence that Missile Defense "*directed, or required*, ECS to offer a subcontract to MDW;" and (3) the SBA Area Office "overlooked that *any subcontract* between ECS and MDW *would have been a bilateral arrangement*[,] requiring the consent of both parties."  AR 3835–36 (citing 13 C.F.R. § 134.314 (2015) (italics added)).

## V.   DISCUSSION - - - WHETHER THE SMALL BUSINESS ADMINISTRATION'S OFFICE OF HEARINGS AND APPEALS' REMAND DECISION WAS "UNLAWFUL, ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, OR OTHERWISE NOT IN ACCORDANCE WITH THE LAW."

### A.   The Parties' Arguments.

#### 1.   Veterans Technology, LLC's Motion For Judgment On The Administrative Record.

Vet Tech argues that the SBA OHA's September 27, 2017 Decision, ruling that Vet Tech failed to rebut the presumption that MDW is economically dependent on ECS, is "contrary to th[e] court's [prior] decision and wholly unjust," because the Administrative Record evidences that Missile Defense was "the cause" of MDW's "subcontracting relationship with ECS."  Pl. Br. at 18 (quoting *Veterans Tech.*, 133 Fed. Cl. at 162).

---

[4]  After the August 18, 2017 SBA Area Office Size Determination on remand was issued in favor of Vet Tech, LSINC filed an appeal with the SBA OHA, although it was not involved in any of the prior proceedings.  On September 27, 2017, the SBA OHA issued a decision reversing the SBA Area Office.  On November 10, 2016, Vet Tech filed a Complaint at the United States Court of Federal Claims challenging the September 27, 2017 SBA OHA Decision.  ECF No. 1. On October 2, 2017, LSINC also filed an Unopposed Motion To Intervene, pursuant to RCFC 24(a)(2), that was granted by the court on October 13, 2017.  ECF Nos. 47, 51.

Specifically, "MDW's initial subcontracting relationship with ECS arose as a direct result of the intervention of [Missile Defense]." Pl. Br. at 18, 20 (citing AR 3851). At a meeting in April 2012, the "Missile Defense lead" implied that ECS should not fire Messrs. Maguire and Dixson, "given their critical skills and essential knowledge" and "ma[de it] clear that ECS should offer MDW a subcontract to ensure that Messrs. Maguire and Dixson could continue servicing [Missile Defense]." Pl. Br. at 18–19 (citing AR 1778, 2393–94, 2630–31, 3727). In addition, [Mr.] Wilson, the President and CEO of ECS, confirmed that the meeting with Missile Defense was the reason MDW decided to enter into a subcontracting relationship with ECS. Pl. Br. at 20 (citing AR 3624–26, 3849–50). After that meeting, "ECS began negotiating a subcontract with MDW, which . . . began on August 1, 2012." Pl. Br. at 20 (citing AR 3851). Because Missile Defense is MDW's "main potential source of revenue," it was "beyond implausible to expect [MDW] to frustrate [Missile Defense]'s objectives and refuse the ECS subcontract[.]" Pl. Br. at 21 (citing AR 3609).

Despite these facts, the SBA OHA's September 27, 2017 Decision ruled that Missile Defense was not "the cause" of the subcontracting relationship between ECS and MDW, because the Administrative Record did not evidence that Missile Defense *required* MDW to accept the subcontract from ECS. Pl. Br. at 22 (citing AR 3835–36). This finding is contrary to the court's remand, because the issue "was not compulsion[,] but fundamental fairness." Pl. Br. at 23 (italics added).

The SBA OHA's Decision is also contrary to the mandate set forth in the Small Business Act, namely, to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns." Pl. Br. at 23–24 (quoting 15 U.S.C. § 631(a)). Because Missile Defense was "the cause" of the subcontracting relationship between ECS and MDW, "punishing MDW (and Vet Tech) for not refusing that subcontract" with ECS is inconsistent with SBA's mandate. Pl. Br. at 24 (citing 15 U.S.C. §§ 631(a), 633(a)). In addition, the terms of the subcontract prohibited the subcontractor from "be[ing] on any other teams without approval o[f] the government and the prime." Pl. Br. at 25 (citing AR 2535). Therefore, MDW was "effectively tied to ECS for years . . . , since in MDW's industry the process from issuance of [a solicitation] to award of a contract often takes up to two years, if not longer." Pl. Br. at 25 (citing AR 2413–14, 2523, 2533–35, 2594–96). Therefore, once Missile Defense caused the subcontracting relationship between ECS and MDW, "[i]t was inevitable . . . that MDW would derive a great deal of its revenue from ECS for a matter of years." Pl. Br. at 25.

Vet Tech adds that the SBA OHA's interpretation of 13 C.F.R. § 121.103(f) (2015) is contrary to the requirements of the Small Business Act. Pl. Br. at 27 (citing 15 U.S.C. § 632(a)(1) (2015) ("a small-business concern . . . shall be deemed to be one which is independently owned and operated and which is not dominant in its field of operation"); 13 C.F.R. § 121.103(f) (2015) ("Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists."). A "small business" is "one which is independently owned and operated and is not dominant in its field of operation." 15 U.S.C. § 632(a)(1). Therefore, the SBA OHA should have focused on independent ownership and operation in interpreting the term "control" in 13 C.F.R. § 121.103(f) (2015). Pl. Br. at 27.

Instead, the SBA OHA "applied a presumption that 'when one concern depends on another for 70% or more of its revenue, . . . the concern is economically dependent on the other' within the meaning of section 121.103(f) 'as a matter of law.'" Pl. Br. at 30 (citing *Size Appeal of Faison Office Prods., LLC*, SBA No. SIZ-4834, 2007 WL 458217, at *8 (Jan. 26, 2007)). This presumption is only compatible with the Small Business Act, if the SBA OHA treats it as a rebuttable, but the SBA OHA continued to insist that the presumption of economic dependence "was irrebuttable in practice[.]" Pl. Br. at 30 (citing AR 3860).

The Administrative Record evidences that "ECS has never had any ability to control MDW," because "MDW's three co-founders retain a collective ownership interest of more than 95%, with the remainder going to a new hire the team brought on in 2014" and MDW was not economically dependent on ECS. Pl. Br. at 31, 32 (citing AR 1855–86, 2254–58, 2669). Nevertheless, the SBA OHA's September 27, 2017 Decision ruled that the presumption of economic dependence was not rebutted, because "no additional evidence of control is necessary" beyond a showing 70% or more in revenues derived from one concern, under 13 C.F.R. § 121.103(f) (2015). Pl. Br. at 32 (citing AR 3824–35, 3838 (emphasis omitted)). As such, the SBA OHA's application of 13 C.F.R. § 121.103(f) (2015) is erroneous and "cannot be reconciled with the dictates of the Small Business Act[.]" Pl. Br. at 32.

Therefore, Vet Tech requests that the court "reverse the decision below, enter judgment in favor of Vet Tech, and order [Missile Defense] to reinstate the award of the Contract to Vet Tech." Pl. Br. at 35.

## 2. The Government's Response And Cross-Motion For Judgment On The Administrative Record.

The Government responds that Vet Tech misinterprets the SBA OHA's September 27, 2017 Decision, because

> MDA *merely encouraged* or *recommended* that ECS subcontract with MDW, or perhaps expressed reservations about the substitution of key personnel on short notice, the ensuing subcontract was the result of voluntary business decisions on the part of ECS and MDW, not a direct subcontract.

AR 3836 (italics added).

In other words, "[e]ven if, or even in the event that, Missile Defense 'had encouraged or recommended that ECS subcontract with MDW' or 'perhaps had expressed reservations about' substituting key personnel, the subcontract nevertheless was the result of MDW's and ECS's voluntary business decisions, rather than any compulsion by Missile Defense." Gov't Br. at 13. This becomes clearer, when read in the context of the entire SBA OHA September 27, 2017 Decision, that the SBA Area Office erred in finding that Vet Tech rebutted the presumption of economic dependence, as it "relied primarily on Vet Tech's contention that ECS was directed to subcontract with MDW by [Missile Defense.]" Gov't Br. at 13 (citing AR 3835–36). In short, the SBA Area Office was "unable to corroborate Vet Tech's version of events with [Missile Defense]."

Gov't Br. at 13 (citing AR 3835). This is so, because the Contracting Officer "denied that any such direction occurred, at least from any [Missile Defense] official with contracting authority" and "no documentation was found in [Missile Defense] contractual records to support this claim." Gov't Br. at 13 (citing AR 3835).

Vet Tech's "submissions to the [SBA] Area Office [did] not clearly support the notion that [Missile Defense] directed, or required, ECS to offer a subcontract to MDW," so there was "no merit to the notion that [Missile Defense] required MDW to subcontract with ECS[.]" Gov't Br. at 14 (citing AR 3835). In addition, Vet Tech mischaracterizes the court's August 2, 2017 Memorandum Opinion And Order insofar as it observed: "*if* Missile Defense required MDW to enter into a subcontracting relationship with ECS, and subsequently approved of such contacting work, it would be unjust to disqualify Vet Tech from future government contracting opportunities." Gov't Br. at 19 (quoting *Veterans Tech.*, 133 Fed. Cl. at 161 (italics added)). Therefore, the remand was to afford the SBA an opportunity to "ascertain *whether* the actions of DOD and/or Missile Defense were the cause of MDW entering into a subcontracting relationship with ECS[.]" Gov't Br. at 19–20 (citing *Veterans Tech.*, 133 Fed. Cl. at 162 (italics added)). The SBA OHA followed those instructions.

Vet Tech's argument that the SBA OHA's September 27, 2017 Decision is contrary to the mandate set forth in the Small Business Act is likewise flawed, because it relies on Vet Tech's unproven contention that Missile Defense "made clear that [Messrs. Maguire and Dixson] needed to continue servicing the contract worked on at Paradigm one way or another given their unique skill set and expertise." Gov't Br. at 20 (citing Pl. Br. at 23–24 (citing 15 U.S.C. § 631)). Similarly, Vet Tech's argument, that the SBA OHA's September 27, 2017 Decision is "[p]unishing MDW (and Vet Tech) for not refusing" the subcontract ECS offered, is based on an unsubstantiated contention that "Vet Tech already established itself as a small business, which, for purposes of this Contract, it has failed to do." Gov't Br. at 20 (citing Pl. Br. at 20 (citing 15 U.S.C. § 631)). Therefore, on remand, the SBA OHA considered these contentions and properly rejected them, based on the evidence. Gov't Br. at 22 (citing AR 3835).

Even if Vet Tech's contentions that "the alleged April 2012 meeting between ECS and an unnamed [Missile Defense] 'lead' are not summarily rejected due to their reliance on unproven assumptions," the SBA OHA's September 27, 2017 Decision is not arbitrary and capricious, because the Administrative Record does not evidence that Missile Defense "caused" MDW to subcontract with ECS. Gov't Br. at 23. This is so, because "whether MDW decided to enter into a subcontract with ECS was MDW's choice to make[.]" Gov't Br. at 23. In support, the SBA OHA cited Vet Tech's acknowledgement that ECS "concluded that subcontracting with MDW would be 'the easiest path,' as an alternative to 'asking for approval for a new subject matter expert.'" Gov't Br. at 24 (citing AR 3836 (quoting AR 3827–28)). Therefore, the SBA OHA's September 27, 2017 Decision "reasonably concluded that the ECS-MDW subcontract was a negotiated bilateral agreement," so that MDW was under "no obligation to enter into a subcontract with ECS." Gov't Br. at 25 (citing AR 3836).

In addition, SBA's regulations provide that "'entities are affiliates of each other,' and are thus treated as a single enterprise in size determinations, 'when one controls or has the power to control the other.'" Gov't Br. at 29 (quoting 13 C.F.R. § 121.103(a)(1) (2015)). But, Vet Tech insists that the SBA OHA erred in ruling that "reliance on a large customer" constitutes "control." Gov't Br. at 29. The SBA OHA, however, "did not disqualify Vet Tech simply because ECS was a 'large customer' of MDW. Rather, central to [the SBA] OHA's analysis were (1) MDW's undisputed reliance on ECS for the overwhelming majority of its business *and* (2) ECS's undisputed status as a large business." Gov't Br. at 30 (emphasis in original).

Vet Tech also misinterprets 13 C.F.R. § 121.103 (2015), as requiring the SBA Area Office to find "some measure of control beyond economic dependence in order to find that affiliation exists." Gov't Br. at 38. To the contrary, the SBA OHA "repeatedly [has] held that no additional evidence of control is necessary beyond economic dependence." Gov't Br. at 38 (citing AR 3838). Nor are Vet Tech's conclusory assertions sufficient to rebut SBA the presumption of economic dependence, *i.e.*, "MDW actively sought to diversify its business," MDW won a series of prime and subcontracts that did not involve ECS, and "MDW was well-equipped to function as a freestanding small business even without any revenue from ECS." Gov't Br. at 32–33 (quoting Pl. Br. at 31). Nor are Vet Tech's policy arguments relevant. Gov't Br. at 30–31.

The bottom line is the SBA OHA "walked through the evidence that might be viewed as supporting Vet Tech's position, as well as the evidence that detracted from Vet Tech's position" and concluded that Vet Tech's arguments were not sufficient to rebut the presumption of economic dependence. Gov't Br. at 33–34 (citing AR 3837–40). Specifically, the SBA OHA's September 27, 2017 Decision ruled that "MDW had no other source of revenue besides ECS during 2012 or 2013" and "as to what might have transpired in the absence of MDW's subcontracts with ECS" would require speculation, because Vet Tech did not provide details "to quantify the impact of foregoing ECS subcontracts" nor "point to any documentary evidence to support the notion that MDW had no other significant expenses aside from contract labor." Gov't Br. at 34 (citing AR 3839). Likewise, Vet Tech's argument that "MDW could have easily obtained non-ECS work in lieu of ECS work" is unpersuasive, because Vet Tech did not identify "any non-ECS projects that MDW declined due to its commitments with ECS." Gov't Br. at 34 (citing AR 3839).

Finally, Vet Tech's request that the court direct an award in Vet Tech's favor "asks the [c]ourt to go beyond the proper scope of review . . . to make an actual size determination . . . , a role that is reserved for the SBA." Gov't Br. at 42.

### 3.   LSINC Corporation's Response And Cross-Motion For Judgment On The Administrative Record.

LSINC adds that the facts in the Administrative Record support the SBA OHA's ruling that the subcontract between ECS and MDW "was the result of voluntary business decisions on the part of ECS and MDW, not a directed subcontract." Int. Br. at 16 (quoting AR 3835–36). First, "the identity, authority[,] and contract role of the [Missile Defense] lead is not specified," so "the extent to which he or she could or did exercise power over ECS/Paradigm is completely unknown." Int. Br. at 17. The SBA Area Office recognized that the Contracting Officer did not authorize the subcontract and was "not aware of anyone else with contractual authority issuing any such direction." Int. Br. at 18 (quoting AR 3755). Therefore, there is no support for Vet Tech's

16

claim that ECS was required to subcontract with MDW, because only a contracting officer can bind the Government in connection with contract performance.  Int. Br. at 18 (citing 48 C.F.R. § 43.102(a) (2015) ("Only contracting officers acting within the scope of their authority are empowered to execute contract modifications on behalf of the Government."); 48 C.F.R. § 1.602 (2015) (describing duties of the contracting officer)).

In addition, "the April 2012 meeting, which is the only cited [G]overnment communication that allegedly 'caused' MDW's ECS subcontract, did not involve MDW or any of its principals." Int. Br. at 18.  The only communication alleged in this case is between Missile Defense and ECS, not between Missile Defense and MDW.  Int. Br. at 18.  Therefore, there is no basis for any concern that, "if Missile Defense *required MDW* to enter into a subcontracting relationship with ECS, and subsequently approved of such continuing subcontracting work, it would be unjust to disqualify Vet Tech from future government contracting opportunities."  Int. Br. at 19 (italics in original, bold omitted) (quoting *Veterans Tech.*, 133 Fed. Cl. at 161).  Instead, ECS made a business decision to offer MDW a subcontract and MDW "decided to accept a subcontract with ECS that produced over two million dollars in revenue."  Int. Br. at 19 (citing AR 2655).  MDW's financial motivation is "a much more logical motivator for MDW's conduct than non-existent communications or requirements from the [G]overnment."  Int. Br. at 19.  Therefore, the SBA OHA correctly ruled that Missile Defense did not cause the subcontracting relationship between ECS and MDW.  Int. Br. at 19 (citing AR 3836–37).

### 4. Veterans Technology, LLC's Reply In Support Of The Motion For Judgment On The Administrative Record And Response To The Government's Cross-Motion.

Vet Tech adds that the SBA OHA's September 27, 2017 Decision was arbitrary and capricious, because it interpreted the remand instructions to ascertain whether Missile Defense formally compelled MDW to subcontract with ECS.  Pl. Resp. at 4.  Instead, the SBA OHA should have determined whether Missile Defense played *a significant role* in causing ECS to subcontract with MDW.  Pl. Resp. at 4–8 (citing AR 2393 (MDW notified Missile Defense of Messrs. Maguire and Dixson's intended departure from ECS); AR 1778, 2535, 2668, 3609, 3625, 3727.  In addition, MDW "actively pursued government contracts without ECS wherever it could and demonstrated that it was not dependent on revenue from ECS at any time.  Pl. Resp. at 6 (citing AR 2594–96, 2598–2601, 2669).

The SBA has the burden of proof to establish that MDW was dependent on ECS; the burden is not on Vet Tech to establish MDW's independence.  Pl. Resp. at 10 (citing Gov't Br. at 16).  The Government produced no evidence contradicting MDW and Vet Tech's evidence that Missile Defense's "intervention made the critical difference [in] MDW getting a subcontract."  Pl. Resp. at 11.  Even if Missile Defense "did not compel ECS or MDW to do anything," Missile Defense nonetheless initiated the meeting that resulted in a subcontract between ECS and MDW for the sole benefit of Missile Defense.  Pl. Resp. at 15.

Vet Tech also adds that the presumption of economic dependence must be rebutted, if "the evidence shows that a business is 'independently owned and operated' as a matter of fact[.]" Pl. Br. at 16.   Yet, the SBA OHA's September 27, 2017 Decision ruled that the presumption of "economic dependence was not rebutted, even though it found that "ECS has no power to control MDW[.]" Pl. Resp. at 16 (citing AR 3839).

Finally, it is within the court's authority to hold that Vet Tech is eligible for the contracts, because it is authorized to "render judgment upon any claim against the United States founded . . . upon . . . an[] Act of Congress" 28 U.S.C. § 1491(a)(1), and "provide an entire remedy and to complete the relief afforded by the judgment[.]"   Pl. Resp. at 26 (citing 28 U.S.C. § 1491(a)(2)); *see also* 28 U.S.C. § 1491(b)(2) (the "Court of Federal Claims . . . may award any relief that the court considers proper").

### 5.     The Government's Reply In Support Of The Cross-Motion For Judgment On The Administrative Record.

The Government's Reply discusses several arguments raised in Vet Tech's response.   First, Vet Tech argues that

> it makes no difference that [Mr. Wilson] cannot recall the precise identity of the [Missile Defense] official he met with in April 2012 . . . or exactly what that [Missile Defense] official said in that meeting . . . or that MDW could not 'corroborate' its version of what transpired at those meetings by producing a[ Missile Defense] witness with an identical recollection.

Gov't Reply at 6 (quoting Pl. Resp. at 9–10).

The SBA OHA, however, needed this corroboration, because the Contracting Officer "denied that any such direction occurred, at least from any [Missile Defense] official with contracting authority" and "no documentation was found in [Missile Defense] contractual records to support this claim.   Gov't Reply at 7 (quoting AR 3835).   Therefore, it was rational for the SBA OHA to conclude that there was "no merit to the notion that [Missile Defense] required MDW to subcontract with ECS[.]"   Gov't Reply at 7 (quoting AR 3837).

In addition, Vet Tech's argument, that affiliation depends on the independence of the concern's ownership and operation, selectively relies on a portion of 15 U.S.C. § 632 and ignores other relevant sections of the statute.   Gov't Reply at 10 (citing Pl. Resp. at 16).   Section 632(a)(1) states, in relevant part, that "a small-business concern . . . shall be deemed to be one which is independently owned and operated and which is not dominant in its field of operation."   Gov't Reply at 11.   And Section 632(a)(2) states "[*i*]*n addition* to the criteria specified in paragraph (1), the Administrator *may specify detailed definitions or standards by* which a business concern may be determined to be a small business concern for purpose of this chapter or any other Act."   Gov't Reply at 11 (quoting 15 U.S.C. § 632(a)(2)(A) (italics added)).   Therefore, SBA has discretion to provide additional standards in a regulation to define a "small business," *i.e.*, "Concerns and entities are affiliates of each other when one controls or has the power to control the other . . . . It does not matter whether the control is exercised, so long as the power to control exists."   13 C.F.R. § 121.103(a)(1) (2015).   For this reason, the "SBA considers factors such as ownership,

management, previous relationships with or ties to another concern, and contractual relationships, in determining whether affiliation exists." Gov't Reply at 12 (quoting 13 C.F.R. § 121.103(a)(2) (2015)). Therefore, in "determining whether affiliation exists, SBA will consider the totality of the circumstances, and may find affiliation even though no single factor is sufficient to constitute affiliation." 13 C.F.R. § 121.103(a)(5) (2015). Affiliation also may arise, based on identity of interest. Gov't Reply (citing 13 C.F.R. § 121.103(f) (2015) ("Affiliation may arise among two or more persons with an identity of interest. Individuals or firms that have identical or substantially identical business or economic interests (such as . . . *firms that are economically dependent through contractual or other relationships*) may be treated as one party with such interests aggregated . . . [and] an individual or firm may rebut that determination with evidence showing that the interest deemed to be one are in fact separate.") (italics added)). Therefore, Vet Tech's interpretation is not consistent with the statutory or regulatory scheme, as a whole. Gov't Reply at 13 (citing Pl. Resp. at 17).

Finally, Vet Tech's reliance on language from the court's August 2, 2017 Memorandum Opinion And Order, stating "the burden of proof rests on the SBA Area Office to establish dependency[,]" is misplaced, because the court was citing to 13 C.F.R. § 121.102(b) (2007), and that "regulation relates to the SBA's establishment of size standards, as opposed to whether a particular firm meets a particular standard." Gov't Reply at 17. Since Vet Tech is not challenging the size standard, that regulation is inapplicable. Gov't Reply at 17.

### 6.  LSINC Corporation's Reply In Support Of The Cross-Motion For Judgment On The Administrative Record.

LSINC further argues that "[t]he only evidence that even describes the April 2012 meeting from a participant's perspective is a single paragraph of a declaration from [Mr.] Wilson, the President and CEO of ECS. . . . The sum and substance of Vet Tech's case is that Missile Defense informed Mr. Wilson "that Mr. Maguire and Mr. Dixson had knowledge and skills essential to supporting [Missile Defense]." Int. Reply at 15–16 (quoting AR 3625 (Wilson Decl. ¶ 8)). "[T]here is no hint in Mr. Wilson's statement of any pressure or even mildly coercive conduct on either ECS or MDW that could create the possible injustice defined by this court." Int. Reply at 16. Nor does Vet Tech provide any authority to this effect. Int. Reply at 16.

Finally, to prove that Missile Defense is responsible for MDW's affiliation with ECS, "Vet Tech must show that Missile Defense both caused the initial subcontract to occur and prevented MDW from obtaining sufficient business to rebut the presumption of economic dependence created by the ECS subcontract revenues." Int. Reply at 18. Because Vet Tech did not establish this, the court should reject Vet Tech's argument that Missile Defense caused MDW's economic dependence on ECS. Int. Reply at 19.

### B.  The Court's Resolution.

Congress has defined "a small-business concern . . . [as] one which is independently owned and operated and . . . is not dominant in its field of operation." 15 U.S.C. § 632(a)(1). Congress, however, authorized, "*[i]n addition* to the criteria specified in paragraph (1), [that] the [SBA] Administrator *may specify detailed definitions or standards* by which a business concern may be determined to be a small business concern for purpose of this chapter or any other Act." *See* 15

U.S.C. § 632(a)(2) (italics added).  Accordingly, the SBA issued regulations to define "whether a business entity is small and, thus eligible for Government programs and preferences reserved for 'small business' concerns." 13 C.F.R. § 121.101(a) (2015).  Under these regulations, the size of a business is determined according to classifications in the NAICS Manual, based on the business's annual revenue[5] or number of employees.  *See* 13 C.F.R. § 121.101(b) (2015).

In determining whether a business entity is "small," affiliates must be considered, *i.e.*, "when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." 13 C.F.R. § 121.103(a)(1) (2015).  Therefore, "*[i]t does not matter whether control is exercised*, so long as the power to control exists." 13 C.F.R. § 121.103(a)(1) (2015) (italics added); *see also Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1361 (Fed. Cir. 2015) ("Even if a business falls within the employee and annual receipt limits of the applicable NAICS code, it may fail to qualify as a small business for purposes of the contract[,] if it is affiliated with other entities.  A business is affiliated with another business when one controls or has the power to control the other.") (internal quotation marks and citation omitted).  The SBA considers factors "such as ownership, management, previous relationships with or ties to another concern, and contractual relationships, in determining whether affiliation exists." 13 C.F.R. § 121.103(a)(2) (2015).  When a business is "affiliated" with another, "[t]he average annual receipts size of [the] business concern with affiliates is calculated by adding the average annual receipts of the business concern with the average annual receipts of each affiliate." 13 C.F.R. § 121.104(d) (2015) (italics added).

Affiliation also may exist when two or more businesses have "an identity of interest." 13 C.F.R. § 121.103(f) (2015).  An "identity of interest" arises, when two or more businesses "have identical or substantially identical business or economic interests (such . . . firms that are economically dependent through contractual or other relationships)[.]" 13 C.F.R. § 121.103(f) (2015).  Therefore, when one business depends on another for 70% or more of its revenues, it is presumed that this business is economically dependent on and, therefore, affiliated with the other.  *See Size Appeal of Faison Office Prods.*, SBA No. SIZ-4834, 2007 WL 458217 ("when one concern depends on another for 70% or more of its revenue, that concern is economically dependent on the other.  Given the high probative value of this kind of evidence, the only exception to this holding would be if the dependent concern could prove, by *clear and convincing evidence*, that its interests are separate from the other concern." (emphasis added)).  The presumption of affiliation by economic dependence, however, may be rebutted "with evidence showing that the interests deemed to be one are in fact separate." 13 C.F.R. § 121.103(f) (2015).

On August 2, 2017, the court issued an Order remanding this case to the SBA Area Office "***to ascertain whether the actions of DOD and/or Missile Defense were the cause of MDW entering into a subcontracting relationship with ECS***[.]" *Veterans Tech.*, 133 Fed. Cl. at 162 (bold and italics added).  The court determined that a remand was required to determine whether MDW rebutted the presumption of economic dependence, since the SBA Area Office's initial May 2, 2016 Size Determination entirely failed to consider this "important [if not dispositive] aspect[] of the problem." *Veterans Tech.*, 133 Fed. Cl. at 161 (quoting *Motor Vehicle Mfrs. Ass'n v. State*

---

[5] Generally, annual revenues are computed using the "most recently completed three fiscal years divided by three." 13 C.F.R. § 121.104(c)(1) (2015).

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In short, if Missile Defense was the cause of ECS entering into a subcontract with MDW that could affect its status as a "small business," "it would be unjust to disqualify Vet Tech [on that basis] from future government contracting opportunities."  *Id.* (citing *Size Appeal of Argus and Black, Inc.*, SBA No. SIZ-5204, 2011 WL 1168302, at \*6 (Feb. 22, 2011) (declining to find economic dependence when "a mechanical application of the rule . . . would be an injustice")).

In determining whether two entities are affiliated, the SBA Area Office:

- may consider the "totality of the circumstances," 13 C.F.R. § 121.102(a)(2) (2015);

- must base a formal size determination "primarily on the information supplied by the protestor or the entity requesting the size determination and that provided by the concern whose size status is at issue,"  13 C.F.R. § 121.1009(b) (2015);

- must place the burden on "[t]he concern whose size is under consideration" to establish that it is a "small business," 13 C.F.R. § 121.1009(c) (2015);

- must "give greater weight to specific, signed, factual evidence than to general, unsupported allegations or opinions," 13 C.F.R. § 121.1009(d) (2015); and

- must "base [a] formal size determination upon the record, including reasonable inferences from the record, and . . . state in writing the basis for its findings and conclusions," 13 C.F.R. § 121.1009(e) (2015).

On remand, the SBA Area Office initiated additional fact-finding, by requesting Vet Tech and Missile Defense to "fully explain, in detail, all facts and circumstances pertaining to the subcontracting relationship between MDW and ECS, including the subcontracting relationship's formation and whether the actions of [Missile Defense] were the cause of the subcontracting relationship."   AR 2838–39.   In response, the SBA Area Office received three evidentiary submissions: (1) a September 16, 2016 Sworn Declaration of Mr. Wilson, President and CEO of ECS; (2) a September 23, 2016 Sworn Declaration of Mr. Maguire, President and CEO of MDW; and (3) an August 10, 2017 email from the Contracting Officer.  AR 2845, 3607–26.  Based on this record and reasonable inferences therefrom, the SBA Area Office weighed the information submitted and found that "Vet Tech rebutted the 70% presumption of economic dependence by a [clear and convincing] showing that [Missile Defense] caused ECS and MDW's subcontracting relationship."  AR 3727; *see also* 13 C.F.R. § 121.103(f) (presumption of economic dependence may be rebutted).

On appeal, the SBA OHA was required to review a SBA Area Office's size determination "based on clear error of fact or law."  13 C.F.R. § 134.314 (2015).  Under this standard of review, "[a] finding is clearly erroneous when[,] although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 622 (1993) (internal corrections and citation omitted); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1224 (Fed. Cir. 2004) (same); *Size Appeal of Taylor*

*Consultants, Inc.*, SBA No. SIZ-4775, 2006 WL 1484895 (Apr. 7, 2006) (same).[6]  The United States Supreme Court has described the "clearly erroneous" standard as "significantly deferential." *See Concrete Pipe*, 508 U.S. at 623.   The United States Supreme Court, however, has also instructed lower courts and tribunals that the "clearly erroneous" standard "does not entitle a reviewing [body] to reverse the finding of the trier of fact simply[,] because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 573 (1985).  Nor does the "clearly erroneous" standard permit the reviewing body to "duplicate the role" of the trier of fact by reviewing the decision *de novo. Id.* ("In applying the clearly erroneous standard . . . , the [reviewing body] must constantly have in mind that their function is not to decide factual issues *de novo.*").  Instead, "[i]f the [trier of fact's] account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing body] may not reverse it[.]" *Id.* at 573–74.  Moreover, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.  This is true, "even when the [trier of fact's] findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.*

The following analysis applies these principles to the SBA OHA's September 27, 2017 Decision.

First, the SBA OHA ruled that the August 18, 2017 SBA Area Office Size Determination on remand was "clearly erroneous," because the SBA Area Office "was unable to corroborate[7] Vet Tech's version of events with [Missile Defense]."  AR 3835.  The SBA OHA's support for this proposition was a Contracting Officer's August 10, 2017 email that denied "any such direction occurred, at least from any [Missile Defense] official with contracting authority, and further stated that no documentation was found in [Missile Defense] contractual records to support this claim." AR 3835.  SBA regulations, however, do not require that the SBA Area Office "corroborate" evidence submitted by the protestor.  Instead, the SBA Area Office is required to weigh the evidence and make a finding that is "*based primarily on the information supplied by the protestor or the entity requesting the size determination and that provided by the concern whose size status is at issue.*" 13 C.F.R. § 121.1009(b) (2015) (italics added).  In addition, SBA regulations require that the SBA Area Office "give greater weight to specific, signed, factual evidence than to general, unsupported allegations or opinions." 13 C.F.R. § 121.1009(d) (2015).  Since the Contracting Officer's August 10, 2017 email was not sworn, the SBA OHA could not have formed a "definite and firm conviction that a mistake [had] been committed." *See Concrete Pipe*, 508 U.S. at 622 ("[a] finding is clearly erroneous when although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed").  Moreover, the Contracting Officer's August 10, 2017 email notably did not

---

[6]  Decisions from the SBA OHA are final.  *See* 13 C.F.R. § 134.316(d) ("The [SBA OHA's] decision is the final decision of the SBA[.]"); *see also* 13 C.F.R. § 134.226(a)(2) ("An [SBA] OHA decision creates precedent unless . . . another regulation in this chapter applicable to a specific type of appeal provides that the [SBA] OHA decision does not create precedent; or the decision is designated as one not to be cited as precedent.").

[7]  "Corroborate" is defined as "[t]o strengthen or confirm; to make more certain[.]" *Corroborate*, BLACK'S LAW DICTIONARY (10th ed. 2014).

represent that she was the Contracting Officer in April 2012, when the relevant discussions between MDW and Missile Defense or those of Missile Defense with ECS took place.  AR 2845.  In fact, the Contracting Officer did not state that she even had first-hand knowledge of the underlying facts, only "cognizance."[8]  AR 2845.  Therefore, it is clear that the SBA OHA decided to re-weigh the evidence and afford the Contracting Officer's August 10, 2017 email more weight than the two sworn Declarations submitted by Mr. Wilson and Mr. Maguire.  This was impermissible under the "clearly erroneous" standard of review as set forth in 13 C.F.R. § 134.314 and controlling precedent.  *See Anderson*, 470 U.S. at 573–74 (where the SBA Area Office's "account of the evidence is plausible in light of the record viewed in its entirety, the [SBA OHA] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently").

Second, the SBA OHA ruled that the August 18, 2017 SBA Area Office Size Determination on remand was "clearly erroneous," because it did "not clearly support the notion that [Missile Defense] directed, or required, ECS to offer a subcontract to MDW."  AR 3835.  Although the SBA Area Office found that ECS viewed the subcontract with MDW as "the easiest path" and an alternative to asking Missile Defense "for approval for a new subject matter expert" (AR 3835–36), the SBA OHA disagreed and found that the SBA Area Office "overlooked that any subcontract between ECS and MDW would have been a bilateral arrangement requiring the consent of both parties."  AR 3836.  In support, the SBA OHA relied on "Mr. Wilson's [September 23, 2016 Sworn D]eclaration . . . [that] explains that after the April 2012 meeting with [Missile Defense], 'ECS began negotiating a subcontracting with MDW.'"  AR 3836.  But, the relevant portion of Mr. Wilson's September 16, 2016 Sworn Declaration was that Missile Defense initiated a meeting to inform him that Messrs. Maguire and Dixson's roles on the MiDAESS contract were "essential" to performance.  AR 3625.[9]  Therefore, the SBA OHA mischaracterized and re-weighed the SBA Area Office's determination that it was Missile Defense that initiated the meeting with ECS to emphasize the importance of Messrs. Maguire and Dixson to the continued performance of the MiDAESS Contract.  AR 3609.[10]  Again, the SBA OHA's Decision was

---

[8]  "Cognizance" is defined as "[a]cknowledgement or admission of an alleged fact[.]" *Cognizance*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Cognizance*, WEBSTER'S NEW WORLD DICTIONARY (5th ed. 2016) (defining "cognizance" as "perception or knowledge").

[9]  "Shortly [after learning that Mr. Maguire and Mr. Dixson were planning to leave Paradigm], *[Missile Defense's] lead on the MiDAESS [F]inancial [M]anagement [T]ask [O]rder requested a meeting with me, which took place in April 2012.  At this meeting [Missile Defense] informed me that Mr. Maguire and Mr. Dixson had knowledge and skills essential to supporting [Missile Defense]*."  AR 3625 (Wilson Decl. ¶ 8) (italics added).

[10]  "*[Missile Defense] met with Mr. Wilson and instructed him that Mr. Dixson and I were key personnel on a team for the MiDAESS [Financial Management] Task Order and, for that reason, we had to remain as personnel on the task order*.  Therefore, *to satisfy [Missile Defense]*, we agreed to remain employees of Paradigm for a short transition period until a subcontract could be negotiated between Paradigm and MDW."  AR 3609 (Maguire Decl. ¶ 8) (italics added).

contrary to 13 C.F.R. § 134.314 and controlling precedent.  *See Anderson*, 470 U.S. at 573–74 (where the SBA Area Office's "account of the evidence is plausible in light of the record viewed in its entirety, the [SBA OHA] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently").

Finally, the SBA OHA ruled that the August 18, 2017 SBA Area Office Size Determination on remand was "clearly erroneous," because the evidence did "not clearly support the notion that [Missile Defense] *directed, or required*, ECS to offer a subcontract to MDW." AR 3835. In a similar vein, the SBA OHA ruled that the SBA Area Office should have considered whether "MDW was under any *obligation* [from Missile Defense] to accept such an offer," because even if Missile Defense encouraged or recommended that ECS subcontract with MDW, "the ensuing subcontract was the result of voluntary business decisions on the part of ECS and MDW, not a directed subcontract." AR 3836 (emphasis added). In support, the SBA OHA relied on Mr. Wilson's September 23, 2016 Sworn Declaration that stated, "ECS began negotiating a subcontract with MDW" after the April 2012 meeting between Missile Defense and ECS. AR 3836 (quoting AR 3625 (Wilson Decl. ¶ 8)). The court's remand, however, requested that the SBA Area Office to "ascertain whether the actions of DOD and/or Missile Defense were the *cause* of MDW entering into a subcontracting relationship with ECS," not whether Missile Defense *directed, required, or obligated* ECS to offer a subcontract to MDW. *See Veterans Tech.*, 133 Fed. Cl. at 162 (italics added). A determination of whether Missile Defense "caused"[11] the subcontracting relationship between ECS and MDW is a different inquiry than whether Missile Defense "directed,"[12] "required,"[13] or "obligated"[14] the same. Consequently, the SBA OHA improperly changed and failed to comply with the court's remand. *See Singer Co. v. United States*, 229 Ct. Cl. 589 (Ct. Cl. 1981) (remanding case a second time, because federal agency failed to comply with the court's remand instructions); *see also Bice v. United States*, 72 Fed. Cl. 432 (Fed. Cl. 2006) (determining that the federal agency "committed prejudicial error by failing to follow [the court's] instructions on remand").

In addition, in ruling that ECS and MDW made independent business decisions as to whether to enter into the subcontract, the SBA OHA overlooked the fact that ECS fired Messrs. Wilson and Maguire for starting MDW and had them physically removed from the premises. AR

---

[11]   "Cause" is defined as "[t]o bring about or effect[.]"  *Cause*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[12]   "Direct" is defined as "[t]o instruct (someone) with authority[.]"  *Direct*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[13]   "Require" is defined as "to ask or insist upon, as by right or authority; demand[.]"  *Require*, WEBSTER'S NEW WORLD DICTIONARY (5th ed. 2016).

[14]   "Obligate" is defined as "[t]o bind by legal or moral duty; to make (someone) have to do something[,] because it is the law or has become that person's duty."  *Obligate*, BLACK'S LAW DICTIONARY (10th ed. 2014).

3822.[15]  The only plausible reason that ECS asked them to return was, without their expertise, performance of the MiDAESS Financial Management Task Order would have been adversely impacted and could have resulted in Missile Defense terminating the MiDAESS Financial Management Task Order with ECS for cause.  AR 3822.[16]  Indeed, this is why, after being informed by Mr. Maguire and Mr. Dixson that they no longer would be working on the MiDAESS Financial Management Task Order, that Missile Defense initiated a meeting with ECS to discuss how to remedy this situation.  AR 3826.[17]  Since MDW intended to compete for future business from Missile Defense, an agreement to enter into a subcontract with ECS was a way to demonstrate their interest in satisfying a potential customer.  AR 3826.[18]  Moreover, since MDW demonstrated that it did not need a subcontract with ECS to survive as an independent business,[19] MDW had no reason to have a relationship with ECS any longer than necessary to satisfy Missile Defense, since MDW was established to compete with ECS for new Missile Defense business, as evidenced by this bid protest.  AR 3822.[20]  Therefore, the SBA Area Office's finding that, "Vet Tech has shown that ECS needed MDW for performance of the MiDAESS contract[,] because of the skills and expertise of MDW's personnel, such as Mr. Maguire" was not "clearly erroneous." AR 3728; *see also* AR 3625;[21] AR 3609.[22]  *See Anderson*, 470 U.S. at 573–74 (where the SBA Area Office's

[15]  "ECS considered firing two Paradigm employees, Mr. Mark Maguire and Mr. Lee Dixson, upon discovering that they had established MDW."  AR 3822.

[16]  "The only reason ECS did not carry out the threat [to fire Messrs. Maguire and Dixson] is that the [Missile Defense lead] informed ECS leaders that Mr. Maguire [was] deemed to have critical skills and knowledge essential to the [MiDAESS Financial Management] Task Order execution, and could not be removed on such short notice."  AR 3822.

[17]  "[Missile Defense] met with Mr. Wilson and instructed him that Mr. Dixson and [Mr. Maguire] were key personnel on a team for the MiDAESS [Financial Management] Task Order and, for that reason, we had to remain as personnel on the task order."  AR 3826.

[18]  "[T]o satisfy [Missile Defense], [Messrs. Maguire and Dixson] agreed to remain employees of Paradigm for a short transition period until a subcontract could be negotiated between Paradigm and MDW."  AR 3826.

[19]  *See* AR 3608 (Maguire Decl. ¶ 3).

[20]  As the SBA Area Office found, "[w]hile the current business relationship between ECS . . . and MDW . . . is good with a proper arms-length Prime Contractor-Subcontractor relationship, the initial relationship was somewhat acrimonious and facilitated by a Government requirement resulting in a "directed subcontract."  AR 3822.

[21]  "[Missile Defense] informed [Mr. Wilson] that Mr. Maguire and Mr. Dixson had knowledge and skills essential to supporting [Missile Defense]."  AR 3625 (Wilson Decl. ¶ 8).

[22]  "[Missile Defense] met with Mr. Wilson and instructed him that Mr. Dixson and [Mr. Maguire] were key personnel on a team for the MiDAESS [Financial Management] Task Order and, for that reason, we had to remain as personnel on the task order."  AR 3609 (Maguire Decl. ¶ 8).

"account of the evidence is plausible in light of the record viewed in its entirety, the [SBA OHA] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently").

For these reasons, the court has determined that the SBA OHA's September 27, 2017 Decision was not in accordance with law and was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); *see also State Farm*, 463 U.S. at 43 (holding that a decision is arbitrary and capricious, when a federal agency "entirely failed to consider an important aspect of the problem"); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) ("the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of the judgment").

## VI.    CONCLUSION.

For these reasons, Vet Tech's November 7, 2017 Motion For Judgment On The Administrative Record is granted.  The Government's December 7, 2017 Motion For Judgment On The Administrative Record and LSINC's November 28, 2017 Motion For Judgment On The Administrative Record are denied.  The SBA OHA's September 27, 2017 Decision is reversed and vacated.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**